# UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

| | |
|---|---|
| Scott Durand and The Estate and Trust of Mary Idella Durand,<br><br>    Plaintiffs,<br><br>v.<br><br>Bank of America, Countrywide Home Loans, Residential Credit Solutions, Inc., and The Bank of New York as trustee for the Certificateholders of CWMBS, Inc. CHL Mortgage Pass-Through Trust 2007-20, Mortgage Pass-Through Certificates, Series 2007-20,<br><br>    Defendants. | Case No. 15-cv-00126 (SRN/SER)<br><br><br><br>**MEMORANDUM OPINION<br>AND ORDER** |

Todd Murray, Friedman Iverson, 509 First Avenue Northeast, Suite 2, Minneapolis, MN 55413, for Plaintiffs.

Curt N. Trisko, The Academy Law Group, P.A., 25 Dale Street North, St. Paul, MN 55102; Jared M. Goerlitz, PFB LAW, P.A., 55 East Fifth Street, Suite 800, St. paul, MN 55101; Keith S. Anderson, Bradley Arant Boult Cummings LLP, One Federal Place, 1819 Fifth Avenue North, Birmingham, AL 35203; Mark G. Shroeder, Briggs and Morgan, P.A., 2200 IDS Center, 80 South Eighth Street, Minneapolis, MN 55402, for Defendants.

---

SUSAN RICHARD NELSON, United States District Judge

   This matter is before the Court on Defendants' Joint Motion for Summary Judgment

[Doc. No. 69]. For the reasons stated below, Defendants' Motion is granted.

## I. BACKGROUND

### A. Loan and Mortgage Origination

This lawsuit arises from the circumstances surrounding a loan purportedly obtained by Mary Idella Durand ("Mary") on August 3, 2007 and the related mortgage (the "Mortgage") placed on her home in Burnsville, Minnesota (the "Property"). The Mortgage identified the Property as collateral for a promissory note in the amount of $105,000.00 (the "Note"). (Decl. of Curt Trisko ("Trisko Decl.") [Doc. No. 72], Ex. A; Decl. of Jennifer Moure ("Moure Decl.") [Doc. No. 73], Ex. 1.) Of the amount borrowed, $54,257.38 was used to pay off a previous mortgage on the Property[1] and $47,106.26 was available for direct disbursal to the borrower. (Aff. of Todd Murray ("Murray Aff.) [Doc. No. 77], Ex. 9 at 34.) According to a disbursal authorization form, purportedly bearing Mary's signature, the funds were disbursed via overnight courier to "JD" at an address in Apple Valley, Minnesota. (Moure Decl., Ex. 2 at 9; Murray Aff., Ex. 3 at 19.) The initials JD apparently signified Jeff Durand ("Jeff"), one of Mary's four children. (*See* Am. Compl. at ¶¶ 11, 20-27 [Doc. No. 26].)

The Mortgage was delivered to Mortgage Electronic Registration Systems, Inc. ("MERS") as nominee for Defendant Countrywide Home Loans ("Countrywide"). (Trisko Decl., Ex. A; Moure Decl., Ex. 1.) Defendant Bank of America, N.A. ("BANA") is the successor-by-merger to Countrywide and was a servicer of the Mortgage. Defendant Residential Credit Solutions, Inc. ("RCS") later obtained the Mortgage and serviced it until

---

[1] Prior to the execution of the Mortgage in question, the Property was subject to another mortgage. (Aff. of Todd Murray [Doc. No. 77], Ex. 4 at 22).

March 1, 2016. (Aff. of Marlon Frazier ("Frazier Aff.") at 1 [Doc. No. 74].) On April 5, 2012, the Mortgage was assigned to Defendant Bank of New York Mellon fka The Bank of New York ("BNYM"), as trustee for the Certificateholders of CWMBS, Inc. CHL Mortgage Pass-Through Trust 2007-20, Mortgage Pass-through Certificates, Series 2007-20 ("CWMBS Trust"). (Trisko Decl., Exs. B-1, B-2.) CWMBS Trust, with BYNM serving as trustee, was the last holder of the Mortgage and is the current owner of the Property. (*See* Aff. of Jared M. Goerlitz ("Goerlitz Aff.") [Doc. No. 5], Exs. 4, 5, 7, 8, 10.)

### B. Attempted Rescission of the Mortgage

Plaintiff Scott Sponslier Durand[2] ("Durand") is another of Mary's children. (Am. Compl. at ¶ 11 [Doc. No. 26].) In September 2009, more than two years after the closing, Durand drafted a letter to BANA on behalf of his mother (the "Rescission Notice"). (First Aff. of Scott Durand ("First Durand Aff.") [Doc. No. 78-1], Ex. A.) The Rescission Notice alleged that the Mortgage was the result of a fraud wherein Jeff, by virtue of a "relationship" he had with BANA/Countrywide, used the Property as collateral for the Note without Mary's knowledge or consent. (*Id.*) Notably, Jeff is not a Defendant in this case.

The Rescission Notice also purported to assert Mary's right to rescind the Mortgage. (*Id.*) It did not bear Mary's signature, or any other signature, but stated that it was "[d]rafted by Scott Durand." (*Id.*) There is no evidence, other than Durand's assertion, that the Rescission Notice was in fact sent to BANA.

---

[2] Plaintiff is also known as David Scott Durand. (Trisko Decl., Ex. D at 44.)

### C. The Trust Agreement and Will

On December 16, 2009—two years after the execution of the Mortgage and shortly after the Rescission Notice was sent—Mary executed a trust agreement (the "Trust Agreement"). (First Durand Aff., Ex. B.) In it, Mary acknowledged the Mortgage, noting "I have lent to my son, Jeffrey Durand, the sum of $105,000, which has been obtained by placing a mortgage on the homestead." (*Id.* at 6.) The document also reflects Mary's understanding that Jeff was responsible for paying the Mortgage's monthly statements. The agreement states that "[i]f Jeffrey fails to pay the monthly payments on the mortgage, the balance that he owes to me (represented by the mortgage balance) shall be immediately due and payable to the trust." (*Id.*) Durand believes that the Trust Agreement was binding and legally enforceable. (First Durand Aff. at ¶ 21.)

Under the terms of the Trust Agreement, Durand held the right to continue residing at the Property after Mary's death, so long as he paid the utilities and insurance and performed necessary maintenance and repairs. (*Id.*) Upon the sale of the Property, the Trust Agreement directed that the sale proceeds be divided equally among Mary's four children. (*Id.* at 6-7.) If the balance owed on the Mortgage at the time of the sale was greater than one quarter of the sale price, Jeff was to receive nothing and pay to the Trust the difference between the Mortgage balance and one quarter of the sale price. (*Id.* at 7.) Otherwise, Jeff's portion of the sale proceeds was to be decreased by the amount remaining on the Mortgage. (*Id.*)

The Trust Agreement appointed Mary's daughter, Kim Durand ("Kim"), as trustee. (*Id.* at 8.) In the event that Kim was unwilling or unable to serve as trustee, the Trust

Agreement designated Durand as trustee. (*Id.*) Mary also executed a last will and testament on December 16, 2009 (the "Will"). (Trisko Decl., Ex. C). Mary passed away in 2012.

### D. The Attempted Modification, Foreclosure, and Postponement

As a result of a default on the Mortgage, foreclosure proceedings were initiated against the Property in March of 2014. (Goerlitz Aff., Ex. 8 at 3.) On April 18, 2014, Durand was personally served with a Notice of Mortgage Foreclosure Sale dated March 24, 2014 (the "Foreclosure Notice"). (*Id.*, Ex. 10 at 8.) The Foreclosure Notice was also published in local newspapers from April 6, 2014 through May 11, 2014. (*Id.* at 2.) At the time Durand was served, the foreclosure sale date was set for May 27, 2014. (*Id.* at 10.)

RCS's loan servicing records reflect that after Durand was served with the Foreclosure Notice, he contacted RCS to inquire about the possibility of a mortgage modification. (Frazier Aff., Ex. 1 at 4.) On April 14, 2014, Durand requested a financial package for a loan modification and the next day RCS mailed the requested materials to him. (*Id.*) On a phone call with RCS, Durand acknowledged receipt of the financial package. (*Id.* at 5.) Durand notified RCS that he intended to apply for a mortgage modification and submit the required documentation. (*Id.* at 6.) However, the application RCS received on May 13, 2014 was incomplete. (*See id.*) RCS's records reflect that they attempted to contact Durand regarding the missing documentation, but ultimately never received the paperwork necessary to process Durand's requested mortgage modification. (*See id.* at 6-17.)

Meanwhile, acting on behalf of the Trust, Kim filed an Affidavit of Postponement, dated May 8, 2014 and recorded it in Dakota County on May 12, 2014, thereby postponing

the foreclosure sale until October 27, 2014. (Trisko Decl., Ex. G at 1-2; Frazier Aff., Ex. 1 at 7.) Sometime in 2014, Durand obtained legal assistance from Lawrence Maloney, an attorney and foreclosure prevention counselor. Mr. Maloney sent a letter to BANA, dated September 12, 2014, stating that he was "investigating apparent or possible impropriety in connection with the loan," requesting certain documentation from BANA, and requesting that BANA investigate the purported fraud by Jeff. (Trisko Decl., Ex. F at 83-84.) There is no response from BANA in the record.

Durand filed for Chapter 13 bankruptcy on October 24, 2014. (Trisko Decl., Exs. H, I.) As a result, the foreclosure sale was postponed until November 18, 2014. (Frazier Aff., Ex. 1 at 13.) The sale was later postponed to January 6, 2015. (Frazier Aff., Ex. 1 at 17; Compl. [Doc. No. 1-1].) BNYM ultimately bought the Property at the foreclosure sale and held it subject to the statutorily mandated five week redemption period. (Goerlitz Aff., Ex. 10 at 19-20.) However, Durand was unable to raise the funds necessary to redeem the Property and the sale was finalized.

### E.  This Lawsuit

Durand initiated this lawsuit *pro se* in Minnesota state court on November 17, 2014—asserting numerous claims related to the execution and validity of the Mortgage—on behalf of himself and the "Trust of Mary Idella Durand."[3] (Compl. at 1 [Doc. No. 1-1].)

---

[3] Mary's Trust designates Kim as the trustee. (First Durand Aff., Ex. B.) Only in the event that Kim is unwilling or unable to serve as trustee is Durand designated to fill that role. (*Id.*) The record does not reflect any evidence of Kim's unwillingness or inability to serve as trustee, nor Durand's proper assumption of that role. Yet, Durand brings suit on behalf of himself and the Trust, claiming that he is acting as the trustee of the Trust. (*See* Am. Compl.; Trisko Decl., Ex. D at 45.)  Ultimately, the Court need not decide whether

BANA removed the action to this Court on January 20, 2015. (Notice of Removal [Doc. No. 1-5].) Defendants then moved to dismiss the suit. (Defs.' Joint Mot. to Dismiss [Doc. No. 3].) However, pursuant to a joint stipulation, several of Plaintiffs' original claims were dismissed with prejudice and Defendants withdrew their Joint Motion to Dismiss based on Durand's agreement to amend the Complaint. (*See* Doc. Nos. 21, 24, 25.)

While this suit was pending before the Court, Durand filed another complaint *pro se* in Minnesota state court on June 24, 2015. (*See* D. Minn. case no. 15-cv-3721 [Doc. No. 1-1].) Substantively, the allegations in the second case are identical to those in the first case, except that the second case omits Count IV and names RCS as the sole defendant. RCS subsequently removed the second case to federal court and it was consolidated with this case. (*See* Consolidation Order [Doc. No. 55].)

After securing counsel, Durand filed his Amended Complaint on July 14, 2015. (*See* Am. Compl.) In it, he asserts six claims: (1) mortgage rescission pursuant to 15 U.S.C. § 1635 (Count I); (2) quiet title (Count II); (3) a request for a writ of mandamus directing the registrar of titles to destroy any relevant encumbrance on the Property (otherwise known as "expungement") (Count III); (4) "mortgage fraud" by Countrywide (Count IV); (5) negligent misrepresentation by BANA (Count V); and (6) fraud by RCS (Count VI). (*See* Am. Compl. at ¶¶ 48-93.)

Defendants now move for summary judgment on all of Durand's claims and filed briefing in support of that motion (*See* Defs.' Joint Mot. for Summ. J.; Defs.' Mem. in Supp.

---

Durand is properly representing the Trust because the claims fail as a matter of law, regardless of the party asserting them.

of Summ. J. ("Defs.' Mem. in Supp.") [Doc. No. 71]; Defs.' Reply Mem. in Supp. ("Defs.' Reply") [Doc. No. 80].)  Durand opposes Defendants' Motion.  (*See* Pls.' Mem. in Opp. [Doc. No. 76].)

## II.    DISCUSSION

### A.  Potential Waiver of Certain Claims

Defendants note that Durand failed to address their challenges to Counts IV-VI and argue that those claims should be dismissed as a result.  (Defs.' Reply at 2 n.2.) A litigant's failure to address challenges to the merits of a claim in his/her response brief amounts to a concession and dismissal is appropriate. *Satcher v. Univ. of Arkansas at Pine Bluff Bd. of Trustees*, 558 F.3d 731, 735 (8th Cir. 2009) ("failure to oppose a basis for summary judgment constitutes waiver of that argument"); *Siepel v. Bank of Am., N.A.*, 239 F.R.D. 558 (E.D. Mo. 2006), *aff'd,* 526 F.3d 1122 (8th Cir. 2008). Durand's failure to address the challenges to Counts IV-VI would warrant dismissing those claims, but in the interest of fairness—and because it does not alter the result—the Court addresses the merits of those claims.

### B.  Legal Standard

Summary judgment is proper if, drawing all reasonable inferences in favor of the non-moving party, there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett,* 477 U.S. 317, 322-23 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249-50 (1986); *Morriss v. BNSF Ry. Co.*, 817 F.3d 1104, 1107 (8th Cir. 2016). "Summary judgment procedure is properly regarded not as a disfavored procedural shortcut, but

rather as an integral part of the Federal Rules as a whole, which are designed 'to secure the just, speedy, and inexpensive determination of every action.'" *Celotex*, 477 U.S. at 327 (quoting Fed. R. Civ. P. 1).

The party moving for summary judgment bears the burden of showing that the material facts in the case are undisputed. *Id.* at 323. However, a party opposing summary judgment "'may not rest upon the mere allegation or denials of his pleading, but ... must set forth specific facts showing that there is a genuine issue for trial,' and 'must present affirmative evidence in order to defeat a properly supported motion for summary judgment.'" *Ingrassia v. Schafer*, 825 F.3d 891, 896 (8th Cir. 2016) (quoting *Anderson*, 477 U.S. at 256-57). "[T]he nonmoving party must 'do more than simply show that there is some metaphysical doubt as to the material facts.'" *Conseco Life Ins. Co. v. Williams*, 620 F.3d 902, 910 (8th Cir. 2010) (quoting *Matsushita Elec. Indus. Co., v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986)). Self-serving affidavits alone cannot defeat a properly supported motion for summary judgment. *Conolly v. Clark*, 457 F.3d 872, 876 (8th Cir. 2006). Rather, a plaintiff "must substantiate [self-serving] allegations with sufficient probative evidence that would permit a finding in the plaintiff's favor." *Davidson & Assocs. v. Jung*, 422 F.3d 630, 638 (8th Cir. 2005). Summary judgment is also proper where the non-moving party fails "'to make a showing sufficient to establish the existence of an element essential to that party's case . . . .'" *Walz v. Ameriprise Fin., Inc.*, 779 F.3d 842, 844 (8th Cir. 2015) (quoting *Celotex*, 477 U.S. at 322).

### C. Quiet Title, Expungement, and Mortgage Fraud—Counts II, III, IV

Durand's claims for quiet title, expungement, and "mortgage fraud" are each premised on his allegation that Jeff—with the help of Countrywide—obtained the Note and Mortgage through forgery and without Mary's consent. (*See* Am. Compl. at ¶¶ 20-26, 55-79; First Durand Aff., Ex. A.) Durand contends that Countrywide participated in this fraud because it stood to acquire the Property—which was worth twice as much as the Note—if there was a default on the Mortgage. (Am. Compl. at ¶¶ 23, 75.) In essence, Durand argues that because the Note and Mortgage are invalid, he is entitled to "relief" in the form of quiet title to the Property and expungement of the Mortgage. (*See* Am. Compl. at ¶¶ 55-69.)

Durand titles Count IV as a claim for "mortgage fraud" and his Amended Complaint contains numerous allegations of forgery. (*See* Am. Compl. at ¶¶ 31, 59, 70-79.) However, Minnesota's criminal statutes for residential mortgage fraud and forgery do not provide private causes of action. *See* Minn. Stat. §§ 609.63 (forgery), 609.822 (residential mortgage fraud); *McDonald v. Allina Health Sys.*, No. A15-0413, 2015 WL 6442585, at *3 (Minn. Ct. App. Oct. 26, 2015) (dismissing a plaintiff's civil claim for forgery because the criminal statute did not provide for a private cause of action). As best the Court can tell, Durand's claim is that the Mortgage was the product of common law fraud by Jeff and Countrywide and is thus invalid. (*See* Am. Compl. at ¶¶ 20-23, 70-79.)

In opposing Defendants' Motion, Durand contends that there are "at least four" disputed facts regarding the Mortgage and its supporting documents that allow his fraud claim to survive. (*See* Pls.' Mem. in Opp. at 5-8.) First, Durand argues that Mary's

"health had deteriorated so much by 2007 that she could not have attended a real estate closing." (*Id.* at 6.) Second, he asserts that when the Mortgage was signed in 2007, Mary could not hold a pen or sign her name legibly. (*Id.*) Third, Durand highlights the fact that the notarized affidavit of identification contained in the closing documents misstates Mary's full name and lists the incorrect year of her birth. (*Id.* at 6-7.) Fourth, he points to a "series of obvious errors"—such as misstatements about Mary's race and income—in the Mortgage application and supporting documents as evidence that they were not completed by Mary. (*Id.*)

To support his contentions, Durand cites the documents themselves and an affidavit he submitted attesting to Mary's health, full name, and other information he believes was misstated in Mortgage. (*See id.* at 1-8; First Durand Aff.) However, Durand did not produce any evidence—such as Mary's medical records, bank statements, or other documentation—that would support his allegations. Durand also admits that he has no personal knowledge of the circumstances surrounding the Mortgage's origination. (Trisko Decl., Ex. D at 43-44.)

> To prevail on a claim of common law fraud, a plaintiff must prove:
>
> (1) a false representation of a past or existing material fact susceptible of knowledge; (2) made with knowledge of the falsity of the representation or made without knowing whether it was true or false; (3) with the intention to induce action in reliance thereon; (4) that the representation caused action in reliance thereon; and (5) pecuniary damages as a result of the reliance. Fraud may also be established by concealment of the truth.

*U.S. Bank N.A. v. Cold Spring Granite Co.*, 802 N.W.2d 363, 373 (Minn. 2011). Importantly here, fraud is an intentional tort and thus "scienter is an essential element."

*Florenzano v. Olson*, 387 N.W.2d 168, 173 (Minn. 1986). "Fraudulent intent is, in essence, dishonesty or bad faith. What the misrepresenter knows or believes is the key to proof of intent." *Id.*

Durand's fraud claim suffers from at least three fatal flaws. First he presents no evidence, besides his bald assertions, of Countrywide's fraudulent intent. Second, there is no evidence to support many of Durand's allegations that the information provided in the Mortgage application was inaccurate and in some instances, the evidence in fact contradicts these assertions. Third, to the extent any misrepresentations were made in the course of obtaining the Mortgage and Note, they were apparently made by Jeff (or Mary) to Countrywide and there is no evidence that Durand or Mary relied—to their detriment—on any misrepresentation made by Countrywide.

### 1. Fraudulent Intent

Durand failed to present *any* evidence of Countrywide's fraudulent intent beyond his bald assertions about its motives for issuing the Mortgage. (*See* Am. Compl. at ¶¶ 70-79; First Durand Aff. at ¶¶ 43-46, 52-53.) Those assertions are not enough to withstand summary judgment. *See Ingrassia*, 825 F.3d at 896; *Conolly*, 457 F.3d at 876; *Jung*, 422 F.3d at 638. Durand also focuses on Jeff's alleged bad character, his motives for obtaining the Note and Mortgage, and the misrepresentations he employed to achieve this end. (*See* Am. Compl. at ¶¶ 16-17, 20-24, 27, 29, 43.) Jeff is not a Defendant and there is no basis to impute his alleged fraudulent intent to Countrywide. The lack of any evidence of fraudulent intent on the part of Countrywide necessitates dismissing Durand's fraud claim. *See Demerath Land Co. v. Sparr*, 48 F.3d 353, 355 (8th Cir. 1995) ("Although it is

true that in cases where intent is at issue, summary judgment must be granted with caution, disposition by summary judgment may still be appropriate if the party in opposition to the motion has adduced no evidence whatsoever of the requisite intent to defraud." (quotation marks and citations omitted)); *Dunning v. Bush*, 536 F.3d 879, 885-86 (8th Cir. 2008) (holding that a lack of evidence of fraudulent intent warrants dismissing fraud claims on summary judgment).

### 2. Evidence of Inaccuracies

In essence, Durand alleges that Jeff obtained the Mortgage without Mary's consent/knowledge in order to benefit himself financially and that Countrywide was somehow an active participant in this scheme. As described above, Durand claims that there are numerous inaccuracies in the Mortgage application, which he sees as evidence that the Mortgage was fraudulently obtained.

Durand presents no evidence in support of some of his claims that information provided in the Mortgage application was inaccurate. For instance, Durand alleges that Mary's income and assets were overstated. (*See* First Durand Aff. at ¶¶ 30, 35-36; Am. Compl. at ¶¶ 72, 74.) However, Durand did not provide any evidence, beyond his bare assertions, of Mary's actual income and assets in 2007. Similarly, Durand alleges that Mary was too infirmed to have attended the Mortgage closing or signed the documents, but does not provide any evidence (e.g., medical records) related to Mary's condition at the time. (First Durand Aff. at ¶¶ 23-24, 27, 29; Trisko Decl., Ex. D at 49 (Durand refusing to provide any of Mary's medical records in response to Defendants' document request).) Durand's unsupported assertions as to what the facts were are not enough to survive summary

judgment. *See Ingrassia*, 825 F.3d at 896; *Conolly*, 457 F.3d at 876; *Jung*, 422 F.3d at 638.

On other issues, the evidence directly contradicts Durand's claims of inaccuracy or fraudulent behavior. For instance, the Trust Agreement—which Durand himself says was properly executed by Mary—explicitly acknowledges the Mortgage and the fact that Jeff benefited from the Note that it secured. This refutes Durand's claim that the Mortgage was obtained without Mary's knowledge or consent. Durand also alleges that the signatures on the Mortgage documents are not Mary's because at the time the documents were signed, Mary was incapable of signing her name due to her various medical conditions. (First Durand Aff. at ¶ 29.) Besides providing no evidence of Mary's medical conditions or when they arose, Durand also offered no evidence of what Mary's signature looked like in 2007. However, the title record for the Property contains seven documents Mary executed between 1973 and 2007, including the Mortgage, each bearing a signature that appears virtually identical to the others.[4] (Trisko Decl., Exs. E-1–E-7.)

Perhaps most problematic for Durand is the fact that a notarized Closing Agent/Notary Public Certification ("Identification Certificate") accompanies the Mortgage documents and attests that Mary was the one who signed those documents. (Murray Aff., Ex. 5 at 26.) To successfully contest the validity of a notarized signature on a mortgage, "clear and convincing testimony is required to oppose and overcome the statutory authentication by which the proof of deeds is established." *Goulet v. Dubreuille*, 86 N.W.

---

[4] Notably, Mary's signature appears to have drastically changed by 2009 when she executed the Trust Agreement and her Will. (See Trisko Decl., Ex. C at 26-27, 40.)

779, 780 (Minn. 1901); *see Summit Mercantile Co. v. Daigle*, 178 N.W. 588, 588 (Minn. 1920) (holding that when a mortgage is "duly acknowledged before a notary public, filed in the proper office, and recited that it was given as security for the payment of an indebtedness," the party seeking invalidation of the mortgage bears the burden of overcoming the presumption of validity by clear and convincing evidence). The Federal Rules of Evidence also provide that "[a] document accompanied by a certificate of acknowledgement that is lawfully executed by a notary public or another officer who is authorized to take acknowledgments" is self-authenticating. *See* Fed. R. Evid. 902(8). To negate the Identification Certificate, Durand bears the burden of proving—by clear and convincing evidence—that the notary deviated from his obligation under Minnesota law "to determine, either from personal knowledge or from satisfactory evidence, that the signature is that of the person appearing before the officer and named therein" or that the notary was not present when the documents were signed. *See* Minn. Stat. § 358.42.

In an attempt to meet this burden, Durand highlights two apparent inaccuracies on the Identification Certificate. First, he points out that Mary's name was recorded as "Mary Herrod Durand" instead of "Mary Idella Durand." (Murray Aff., Ex. 5 at 26; First Durand Aff. at ¶¶ 35-36.) Herrod was Mary's maiden name, a fact established by the death certificate of Mary's husband. (Trisko Decl., Ex. E-6 at 76.) The Identification Certificate makes clear that the notary recorded Mary's name as it appeared on a Minnesota identification card, but that identification card is not in the record. (*See* Murray Aff., Ex. 5 at 26.) Durand produced no evidence that Mary did not have a Minnesota identification card listing her name as "Mary Herrod Durand."

Second, Durand points to the incorrect recording of Mary's birth year as 1929 instead of 1926 on the Identification Certification. (Murray Aff., Ex. 5 at 26; First Durand Aff. at ¶¶ 35-36.) Defendants argue that this is a typo and not evidence of forgery. (*See* Defs.' Reply at 5-6.) As support for this contention, they note that the month and day of Mary's birth were correct on the Identification Certificate. They also observe that each of the other Mortgage documents that include a date of birth correctly state Mary's birth year as 1926.

The minor inconsistencies just discussed do not meet the clear and convincing standard necessary to overcome the statutory presumption in favor of the notarized Identification Certificate. Even if they did and the Court refused to consider the Identification Certificate, Durand's fraud claim would fail for the other reasons stated in this Order.

### 3. Reliance

Finally, Durand failed to present any evidence that—assuming misrepresentations were made in obtaining the Mortgage—he or Mary relied on those misrepresentations to their detriment. Whatever misrepresentations Jeff allegedly made in completing the Mortgage application, he made to Countrywide and not to Mary or Durand. Durand does not even allege that Countrywide made a misrepresentation on which he or Mary could have relied. Moreover, there is no evidence of any damage resulting from the misrepresentations Durand alleges. The Trust Agreement states that the parties got what they bargained for— namely, Mary received $105,000 in exchange for Countrywide placing a mortgage in that amount on the Property.

Durand's fraud claim in Count IV is dismissed because there is no evidence of fraudulent intent on the part of Countrywide, the evidence in the record largely contradicts Durand's allegations, and there is no sign of detrimental reliance on a misrepresentation made by Countrywide. Since Durand's claims for quiet title and expungement in Counts II and III are premised on the fraud claim, those claims are also dismissed.

### D. Rescission of the Mortgage—Count I

Durand further alleges that Countrywide violated the Truth in Lending Act (TILA) and seeks rescission of the Mortgage pursuant to 15 U.S.C. § 1635. (Am. Compl. at ¶¶ 48-54.) The substance of his claim is that Countrywide failed to provide Mary with the required disclosure regarding rescission and that she effectively rescinded the Mortgage through the Rescission Notice in 2009. (*See id.*)

In relevant part, the TILA requires that a lender provide a borrower with a disclosure explaining that the borrower has three business days from the date the mortgage is executed or the disclosure delivered—whichever is later—in which he/she can rescind the mortgage. 15 U.S.C. § 1635(a). A written acknowledgment by the borrower that he/she received such a disclosure creates a rebuttable presumption that the disclosure was delivered. 15 U.S.C. § 1635(c). If no disclosure is provided, the borrower has three years from the date the mortgage is executed in which he/she can rescind. 15 U.S.C. § 1635(f). To exercise the right to rescind, a borrower must provide written notice to the lender within the applicable rescission period. *Jesinoski v. Countrywide Home Loans, Inc.*, 135 S. Ct. 790, 792 (2015) (hereinafter, *Jesinoski I*). If the borrower wishes to collect damages based on the lender's failure to act in accordance with a valid

rescission, he/she must bring suit within one year of the lender receiving the notice of rescission. 15 U.S.C. §§ 1635(b), 1640(e).

There are two related issues surrounding Durand's TILA claim. The first is whether the three day or three year rescission period applied. The second is whether Durand brought suit to enforce the rescission within the statute of limitations. Since the Court concludes that the Rescission Note was untimely—and therefore ineffective—it need not reach the issue of whether Durand brought suit within the statute of limitations.

Defendants argue that Mary was provided with the requisite TILA rescission disclosure and thus her right to rescind expired three business days after the Mortgage was executed. (Defs.' Mem. in Supp. at 13-15.) Defendants produced a certificate, bearing Mary's signature and dated August 3, 2007, acknowledging that she received the TILA rescission disclosures. (Moure Decl., Ex. 6.) Durand contends that Mary was not provided with the disclosures, that it was actually Jeff who received them and signed for them, and points to the supposed inaccuracies in the Mortgage documents discussed above as evidence. (Pls.' Mem. in Opp. at 10-13.) Thus, Durand argues that Mary had three years from the execution of the Mortgage in which to rescind and that she did so by way of the Rescission Notice in 2009. (*See id.*)

The disclosure acknowledgement bearing Mary's signature creates a rebuttable presumption that she was in fact provided with the required disclosures and thus only had three business days following the execution of the Mortgage in which to rescind. 15 U.S.C. § 1635(a), (c). The question is whether Durand has overcome this presumption by presenting evidence that she did not in fact receive the disclosures. He has not.

Again, Durand's primary "evidence" is his own self-serving and unsubstantiated allegations that Mary did not receive the disclosures and that Jeff was the one who actually signed the Mortgage documents. (Am. Compl. at ¶¶ 25, 48-54.) This is not enough to withstand summary judgment, let alone overcome the presumption that Mary was in fact provided with the disclosures. *Jesinoski v. Countrywide Home Loans, Inc.*, 196 F. Supp. 3d 956, 960 (D. Minn. 2016) (hereinafter, *Jesinoski II*) ("The only evidence provided by Plaintiffs to rebut the presumption of receipt [of a TILA rescission disclosure] is their testimony that they did not receive the correct number of documents. [T]his Court has consistently held that statements merely contradicting a prior signature are insufficient to overcome the presumption."); *Keiran v. Home Capital, Inc.*, No. 10-cv-4418 (DSD/JSM), 2015 WL 5123258, at *4 (D. Minn. Sept. 1, 2015) ("the record here is devoid of any evidence—apart from self-serving affidavit testimony—that the defendants failed to provide the required number of disclosure statements or otherwise comply with TILA"). The only other evidence Durand offers are the alleged inaccuracies in the Mortgage documents. As previously discussed, the evidence does not support some of Durand's inaccuracy allegations. Regardless, even considering what inaccuracies the record does show, the evidence is not enough to overcome the presumption that Mary was provided with the TILA rescission disclosures.

Since Mary was provided with the disclosures, her rescission period expired three business days after the Mortgage was executed in August 2007. The Rescission Notice

came more than two years after that time and is ineffective as a result.[5]  Thus, Durand's

rescission claim fails as a matter of law.

### E.  Negligent Misrepresentation by BANA—Count V

Count V states a claim for negligent misrepresentations by BANA.[6]  (Am. Comp.

at ¶¶ 80-86.) This claim is predicated on Durand's assertion that in 2009, sometime after

receiving the Rescission Notice, BANA told Durand that it would refer his fraud

allegations to its fraud department for investigation, but that BANA never conducted any

investigation.[7]  (*See id.* at ¶¶ 34, 40.)

> Under Minnesota law, a person makes a negligent misrepresentation when
> (1) in the course of his or her business, profession, or employment, or in a
> transaction in which he or she has a pecuniary interest, (2) the person
> supplies false information for the guidance of others in their business
> transactions, (3) another justifiably relies on the information, and (4) the
> person making the representation has failed to exercise reasonable care in
> obtaining or communicating the information.

---

[5]  As Defendants point out, there are considerable admissibility issues related to the
Rescission Notice.  (Defs.' Mem. in Supp. at 3 n.3.) The Rescission Notice is unsigned,
purportedly drafted on Mary's behalf by Durand, and there is no evidence that it was ever
actually sent to BANA. This raises, at a minimum, issues of hearsay and authenticity.
However, because the Court concludes that the Rescission Notice was untimely and thus
ineffective, it need not resolve these admissibility issues.

[6]  As previously described, BANA is the successor by merger to Countrywide. However,
according to Durand, Countrywide was first bought by BAC Home Loans Service, LP
("BAC") and BAC was subsequently purchased by BANA.  (Am. Compl. at ¶ 4.) In
considering Durand's negligent misrepresentations claim, the Court assumes that the
representations of Countrywide and BAC are attributable to BANA.

[7]  The Court notes that Durand presents his claim as one for negligent misrepresentations,
but his allegations that BANA knew that the Mortgage was the result of a fraud, yet
failed to take any remedial action and instead actively concealed this fact, sound in fraud.
(*See* Am. Compl. at ¶¶ 83-84.) To the extent Durand alleges BANA committed fraud, his
claim fails because he has not produced any evidence of fraudulent intent.  *See supra* Part
II.C.1.

*Valspar Refinish, Inc. v. Gaylord's, Inc.*, 764 N.W.2d 359, 369 (Minn. 2009). However, unfulfilled promises or statements anticipating future events cannot serve as the basis for a negligent misrepresentation claim. *Trooien v. Mansour*, 608 F.3d 1020, 1030 (8th Cir. 2010); *Labrant v. Mortg. Elec. Registration Sys., Inc.*, 870 F. Supp. 2d 671, 680 (D. Minn. 2012).

Count V fails as a matter of law on several grounds. First, Durand offers no evidence, other than his bald assertions, that BANA actually represented that it would investigate the purported fraud, or that it failed to undertake such an investigation. Second—assuming BANA represented that it would investigate—Durand could not legally rely on this representation by abandoning his own investigation, or assuming that the Mortgage was rescinded or otherwise void. *See Labrant*, 870 F. Supp. 2d at 681 (holding that the plaintiffs did not reasonably rely on the defendant's purported representation—that it would modify their mortgage—when they ceased making payments on the mortgage altogether). Third, Durand's misrepresentation claim hinges on BANA's alleged failure to fulfill its promise to investigate the purported fraud, but unfulfilled promises (or opinions about future events) cannot sustain a claim for negligent misrepresentation. *See Trooien*, 608 F.3d at 1030.

## F.  Fraud by RCS—Count VI

Count VI alleges that RCS committed fraud by inducing Kim and Durand to reduce the redemption period for the Property with the promise that RCS would

"entertain" their application to modify the Mortgage, but that RCS "never intended to entertain" that application. (*See* Am. Compl. at ¶¶ 88-93.)

> Again, to prevail on a claim of common law fraud, a plaintiff must prove:

> (1) a false representation of a past or existing material fact susceptible of knowledge; (2) made with knowledge of the falsity of the representation or made without knowing whether it was true or false; (3) with the intention to induce action in reliance thereon; (4) that the representation caused action in reliance thereon; and (5) pecuniary damages as a result of the reliance. Fraud may also be established by concealment of the truth.

*U.S. Bank*, 802 N.W.2d at 373. Moreover, "under Minnesota law . . . a representation or expectation of future events is not sufficient to support an action for fraud simply because the represented act or event did or did not take place." *Exeter Bancorporation, Inc. v. Kemper Sec. Group, Inc.*, 58 F.3d 1306, 1312 (8th Cir.1995) (quotation marks and citation omitted).

> It is true that, despite this limitation, a misrepresentation of a present intention, for example in a promise to do something prospectively, could amount to a fraud. However, the failure to carry out such a promise, with nothing more, does not constitute fraud; there must be affirmative evidence that, when the maker made the promise, he or she had no intention of keeping it.

*Id.* at 1312.

Again, Durand's fraud claim suffers from several flaws. First, there is no evidence, other than his bald assertions, that there was a *quid pro quo* agreement between Kim, Durand, and RCS that if Kim and Durand postponed the foreclosure sale—thereby reducing the redemption period for the Property when it was sold at auction—RCS would "entertain" their application for a mortgage modification. Instead, the evidence shows that Durand contacted RCS to request a modification application, which RCS provided,

but that Durand failed to properly complete the paperwork. *See supra* Part I.D. This evidence also highlights the second flaw in Durand's claim—that there is no evidence of a false representation by RCS. Rather, the evidence shows RCS did exactly as Durand requested (or, if you accept Durand's account, it promised to do) by providing him with a mortgage modification application and considering that application when it was submitted.

Third, as with Durand's fraud claim against Countrywide, there is no evidence of any fraudulent intent on the part of RCS. *See supra* Part II.C.1. Fourth, assuming that RCS promised to entertain the mortgage modification application, but in fact did not consider it, there is no evidence that RCS did not intend to keep that promise when it was made. *See Exeter Bancorporation*, 58 F.3d at 1312-13 (upholding the dismissal of plaintiff's fraud claim based on an alleged promise where the plaintiff failed to present any affirmative evidence that at the time the promise was made, the defendant did not intend to honor it). Finally, to the extent Durand argues that RCS fraudulently represented that it would in fact modify the Mortgage, his claim is barred by the statute of frauds. *See* Minn. Stat. § 513.33 (requiring that all credit agreements, including mortgage modifications, be in writing); *Myrlie v. Countrywide Bank*, 775 F. Supp. 2d 1100, 1108 (D. Minn. 2011) (promissory estoppel claim related to oral loan modification barred by Minn. Stat. § 513.33); *Tharaldson v. Ocwen Loan Servicing, LLC*, 840 F. Supp. 2d 1156, 1162 (D. Minn. 2011) (holding that "[a] loan modification constitutes a credit agreement" and enforcement of an oral loan modification was thus barred by Minn. Stat. § 513.33); *Labrant*,

870 F. Supp. 2d at 678 (finding that a lender was not equitably estopped from invoking Minn. Stat. § 513.33 and dismissing a claim to enforce an alleged oral loan modification).

## III.    CONCLUSION

The Court is sympathetic to Mr. Durand's situation. Family disputes, especially conflicts between siblings that surround the aging and subsequent passing of a beloved parent, are never easy. However, these conflicts do not necessarily give rise to legal claims, especially against third parties. For the reasons stated above, Durand's claims against Defendants fail as a matter of law.

## IV.    ORDER

Based on the foregoing, and all the files, records, and proceedings herein, **IT IS HEREBY ORDERED THAT:**

1.    Defendants' Joint Motion for Summary Judgment [Doc. No. 69] is **GRANTED**.

**LET JUDGMENT BE ENTERED ACCORDINGLY.**

Dated:  May 30, 2017                    s/ Susan Richard Nelson
                                        SUSAN RICHARD NELSON
                                        United States District Judge